## HAROLD A. MINER V. THE STATE.

No. 22716. Delivered March 1, 1944.

The opinion states the case.

*W. W. Bridgers*, of El Paso, for appellant.

*Roy D. Jackson*, District Attorney, and *Gill L. Newsom*, Assistant District Attorney, both of El Paso, and *Ernest S. Goens*, State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was charged and convicted of the unlawful killing of Marjorie Miner, and by the jury assessed the death penalty.

The facts show that appellant, a man 47 years of age, without any attempt at justification or excuse, killed Mrs. Miner, his divorced wife, by shooting her twice in the back with a pistol while she was screaming and fleeing from him. His sole defense was that of insanity.

Mrs. Alice Spangler, who managed the Belmont Apartments where Mrs. Miner lived, testified, in substance, that about 8:10

early in the morning of May 12, 1943, she was called by phone and asked to go to Mrs. Miner's apartment and ascertain whether she was there and then call the office where Mrs. Miner worked. Mrs. Spangler then went to Mrs. Miner's apartment and called her, and got no answer; she heard groaning of some kind, and taking a pass key she opened the door. Mrs. Miner was sitting in a chair with a cup of coffee in her hand; she immediately arose and said "let me out of here quick," and ran down the hall screaming. Some one then ran out of the room, whom Mrs. Spangler later learned was appellant, with a pistol in his hand, Mrs. Spangler saying: "don't shoot that woman." Appellant fired at the deceased as she ran through the lobby of the apartment; again as she reached the steps, and again as she lay on the ground, her body partially in the yard shrubbery. Two shots struck her near the backbone, one severing the aorta, causing her quick death, the other coming out in front and breaking some of her ribs.

Appellant took the witness stand and evidenced a clear recollection of his life from childhood to the instant of the killing, giving a history of an unhappy childhood caused by domestic disturbances in his home, a history of his service in the first World War, in which he claimed to have contacted the disease of syphilis, and his efforts thereafter to cure this dread disease; of his different changes of employment, evidently being a hotel clerk a large portion of the active part of his life; of his final cure of his disease, and his marriage to the deceased in the State of Iowa, she being 17 years his junior in age; of their indulgence in drinking liquor; of their differences and disagreements, usually caused by their over-indulgence in such liquor; of their separation and his return to Michigan, leaving his wife in El Paso; of her suit for divorce, which was granted some time prior to the killing; of his brooding over the divorce until he decided to return to El Paso and try to persuade her to return to him, and his efforts to thus persuade her; of his suspicions that she was becoming interested in another man, and his decision to arm himself with two pistols, and if she refused to go with him and agree to a reconciliation to forcibly take her away from El Paso and force her to become reconciled to him. He then told of drawing all his money, and taking his two pistols and going to her apartment at about 6:30 of the morning of the killing, claiming that he had been without sleep for two nights and had been drinking heavily for many days. That deceased received him with some cordiality, and gave him a cup of coffee, but would not agree to go with him and effect a reconciliation. That he then showed her a pistol and told her she

would have to go. That she then consented to go, but asked for time to pack her things; he agreed to this; that about that time the phone rang and he told her not to answer it, and she did not; that the phone rang again, and he again forbade her to answer; that about this time Mrs. Spangler called her name at the door and, receiving no answer, Mrs. Spangler unlocked the same; the deceased was moaning at such time, and arose and said: "let me out of here," and ran out the door; that he started out the door and slipped or stumbled and fell, striking his head, and he remembered no more relative to the shooting, and his mind remained a blank for some hours thereafter.

The only defense offered was that of insanity, both temporary from the recent use of ardent spirits and ordinary settled insanity.

The trial court's charge embraced both these issues, and we find no objection filed thereto in the record.

Two alienists testified herein; both of them, from their varied experience, showed much contact with patients suffering from the effect of syphilis. One of these experts, Dr. S. D. Swope for the appellant, testified, in substance, that appellant was not a man of normal mind; he was of mentally diseased state of mind, but not an insane person at the time of the trial, but he did not think he knew right from wrong at the time of the trial; he was not adjusted to the ordinary social relationship by reason of mental disease; all criminals have lost their reasoning power up to a certain extent, otherwise they would not be criminals.

Dr. Paul E. McChesney testified in agreement with Dr. Swope relative to the fact that appellant was not insane; he said "You either have a mental disease or you do not have it; insanity itself is not a temporary proposition. This man shows no evidence of insanity, and is responsible for what he did; he has never shown any evidence of insanity."

Appellant's own evidence, which occupies a major portion of the statement of facts, evidences an unhappy life, as well as a wayward one, wasted in over-indulgences that gradually wore away his respect for and obedience to society and its demanding duties. The question of his sole defense of insanity was properly presented to the jury, and by them decided adversely to appellant's contention. The punishment provided by the jury is but a natural consequence of a disregard of the social regulations, as well as the legal rules laid down for our government,

and although exacting the extreme penalty, nevertheless it does not come within our province, nor do we have the right or power under the law and the facts here presented, to set same aside.

There are no bills of exceptions in the record, and naught to show that aught but a fair trial was had under the law.

Finding no error in the record, the judgment is affirmed.